IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
December 15, 2009 Session

## STATE OF TENNESSEE v. TAKEITA M. LOCKE

**Appeal from the Criminal Court for Knox County**
**No. 67739B      Richard Baumgartner, Judge**

---

**No. E2009-00065-CCA-R3-CD - Filed July 6, 2010**

---

The Defendant, Takeita M. Locke, appeals her conviction for criminally negligent homicide and the trial court's denial of her petition for writ of error coram nobis for a related especially aggravated robbery conviction. She had been convicted in an earlier trial of especially aggravated robbery related to the same facts and victim. For the homicide conviction, the Defendant received a sentence of two years as a Range I offender, to be served concurrently with the twenty-year sentence she was serving for the especially aggravated robbery conviction. On appeal, she challenges (1) the trial court's denial of her motion to dismiss for violation of her right to a speedy trial, and (2) the trial court's denial of her petition for writ of error coram nobis related to the especially aggravated robbery conviction. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the Court, in which JAMES CURWOOD WITT, JR. and NORMA MCGEE OGLE, JJ., joined.

Wade V. Davies, Knoxville, Tennessee, for the appellant, Takeita M. Locke.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; Randall E. Nichols, District Attorney General; and Ta Kisha Fitzgerald, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The Defendant, who was seventeen years old on the date of the crimes, was charged as an adult with first degree felony murder and especially aggravated robbery of Chuck Newman. Jerry Graves was also charged with the offenses. The Defendant was tried and

convicted of both counts in October 1999. On appeal to the Tennessee Supreme Court, she successfully challenged the jury instructions given for the felony murder count and was granted a new trial for that conviction. The especially aggravated robbery conviction was affirmed. See State v. Locke, 90 S.W.3d 663 (Tenn. 2002). In a separate trial, co-defendant Graves was also convicted of the charged offenses, and the Tennessee Supreme Court affirmed his convictions. See State v. Graves, 126 S.W.3d 873 (Tenn. 2003). On April 4, 2007, the Defendant filed a motion to dismiss the indictment for violation of her right to a speedy trial. The trial court denied the motion. The Defendant was retried for the felony murder count in April 2008, and she was found guilty of the lesser included offense of criminally negligent homicide.

In October 2008, the Defendant filed a petition for writ of error coram nobis, in which she alleged that the testimony of four witnesses at her retrial on the felony murder count was exculpatory of the especially aggravated robbery conviction she received in her first trial. After receiving stipulated and documentary evidence as proof, the trial court denied the petition for writ of error coram nobis as untimely. The Defendant appealed both the conviction of criminally negligent homicide and the coram nobis denial, and this court consolidated the appeals.

**I**

The Defendant challenges the trial court's ruling that her right to a speedy trial was not violated in the retrial of the homicide case. She seeks reversal of the criminally negligent homicide conviction and dismissal of the presentment.

Upon the State's initiation of criminal proceedings, the right to a speedy trial is implicated under the Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution. This right is statutory, as well, in Tennessee. T.C.A. § 40-14-101 (2006). In Barker v. Wingo, 407 U.S. 514, 530 (1972), the Supreme Court devised a balancing test to determine whether a defendant's right to speedy trial was violated and identified the following factors for consideration:

> (1) the length of delay;
> (2) the reason for the delay;
> (3) the defendant's assertion of his right to speedy trial; and
> (4) the prejudice to the defendant.

Id., 407 U.S. at 530. In State v. Bishop, 493 S.W.2d 81 (Tenn. 1973), the Tennessee Supreme Court implicitly adopted the Barker balancing test for our state's constitutional and statutory right to a speedy trial.

A review of the procedural history of the case is necessary for this inquiry. The Defendant was charged by presentment in November 1998. Her first trial was held in October 1999, and her felony murder conviction was reversed and remanded for a new trial in November 2002. The Defendant's second trial was in April 2008. The record reflects that between the date of the reversal of the felony murder judgment and the second trial, the Defendant filed the following motions:

> Motion to Remand Defendant to Juvenile Court Because the Tennessee Juvenile Transfer Statute is Unconstitutional, March 10, 2003

> Motion to Suppress Juvenile Custodial Statements, March 28, 2003

> Motion to Suppress Statement Taken in Violation of Right to Counsel, April 3, 2003

In January 2004, the State filed a motion to prohibit the Defendant from denying or collaterally challenging her conviction of especially aggravated robbery in her retrial for felony murder. The State's motion relied in part upon the favorable ruling for the State by the judge of another division of the Knox County Criminal Court in State v. David Scarbrough, No. 62279B (Knox County Apr. 4, 2003) (order). However, the trial court denied the State's motion. At a hearing on March 19, 2004, the court stated that it would sign an order allowing the State to seek an interlocutory appeal, and the prosecutor said that the State would seek to have the appellate court consolidate the Defendant's appeal with the David Scarbrough case. However, the State never pursued an interlocutory appeal in the Defendant's case. The Tennessee Supreme Court resolved the issue adversely to the State on November 30, 2005, when it filed its opinion in State v. Scarbrough, 181 S.W.3d 650 (Tenn. 2005).

The record next reflects that the Defendant's Motion to Dismiss for Violation of Her Right to a Speedy Trial was filed on April 4, 2007. The motion recited that the case was set for trial on May 15, 2007. The Defendant then filed a Motion to Continue on May 3, 2007, due to counsel's scheduling conflict between the Defendant's motion hearing and trial and a federal case in which counsel was the attorney of record. It appears that the court granted the motion, as the trial took place in April 2008. In the interim, the court conducted hearings on the Defendant's two motions to suppress the Defendant's statements and on the Defendant's motion to dismiss for violation of her right to speedy trial on July 19, 2007, and September 26, 2007. The court denied all three motions. The court also considered several

motions and notices related to trial evidence before the trial began in April 2008.

The first prong of the Barker inquiry is the length of the delay. In the present case, the supreme court reversed the Defendant's felony murder conviction in November 2002 and ordered a new trial, which took place in April 2008, a delay of almost five and one-half years. A delay which approaches one year is sufficient to trigger further inquiry. Doggett v. United States, 505 U.S. 647, 652 (1992); State v. Utley, 956 S.W.2d 489, 494 (Tenn. 1997). However, the complexity of the case is taken into account in evaluating the reasonableness of the length of the delay. State v. Wood, 924 S.W.2d 342, 346 (Tenn. 1996) (citing Barker, 505 U.S. at 652). The length of the delay in the Defendant's case is sufficient for us to evaluate the remaining three Barker factors.

The record reflects that this case was challenging. At the hearing on the motion to dismiss, the court inquired why the State never followed through on submitting an order for the court's signature allowing an interlocutory appeal, and the prosecutor stated, "Truth is, Judge, I think it was just negligence. I just think that because they knew that [the contrary ruling by another Knox County Criminal Court judge in the Scarbrough case] was going to be appealed –." After the supreme court's Scarbrough ruling, another year and five months passed before the Defendant sought dismissal of the case for violation of her speedy trial right. However, the record reflects that the case had been set for trial in May 2007, one and one-half years after the Scarbrough ruling, but was continued due to defense counsel's trial schedule.

No demand for a speedy trial before April 2007 appears in the record. The Defendant argues that she had no obligation to bring herself to trial. While this is an accurate statement of the law, the Supreme Court has cautioned that this "does not mean, however, that the defendant has no responsibility to assert [her] right." Barker, 407 U.S. at 528. A defendant's assertion of her speedy trial right, or failure to assert the right, is a factor to be considered in determining whether a defendant has been denied her right to a speedy trial. See id.

Finally, we assess the prejudice to the Defendant due to the delay. The Defendant claims that the passage of time undoubtedly eroded the memories of key witnesses about the facts related to the sequence of events, a crucial issue in this case. While the passage of time certainly may affect the memory of witnesses, in this case that concern is somewhat lessened because the key witnesses had testified under oath at both the Defendant's first trial and Graves's trial, making their prior testimony available to refresh their recollections or to be used for cross-examination if their memories proved insufficient or flawed. Thus, the delay before the second trial had no effect on the Defendant's ability to challenge her especially aggravated robbery conviction.

We weigh the length of the delay against the State and the reason for the delay against the State. Conversely, we weigh the lack of demand for a speedy trial and the prejudice factors against the Defendant. In assessing the factors, we are troubled by the prosecutor's inability to articulate a satisfactory explanation for the delay. We consider it significant, however, that the Defendant had the benefit of the previous sworn testimony of the key witnesses at her earlier trial and at Graves's trial, and we balance the Defendant's claim of prejudice from witnesses' loss of memory against her failure to demand a speedy trial. Upon consideration, we hold that the trial court did not err in finding that the Defendant was not entitled to have the presentment dismissed based upon a speedy trial violation. The Defendant is not entitled to relief.

## II

The Defendant challenges the trial court's denial of her petition for the writ of error coram nobis. She claims that testimony of Jerry Graves, Robert Richards, Sam Brown, and Joseph Newman at her second trial was newly discovered evidence that would have shown that she was not guilty of especially aggravated robbery had it been presented in her first trial. In support of her petition, she offered a stipulation of the parties and documentary proof, but she did not offer any new testimonial evidence. The Defendant also argues that the speedy trial violation further delayed her ability to present newly discovered evidence of her innocence. She claims that she was without fault in failing to present this evidence within one year of her conviction. The State argues that the Defendant's petition was untimely and without merit. We hold that the trial court properly denied the petition as untimely.

A writ of error coram nobis lies

> Upon a showing by the defendant that the defendant was without fault in failing to present certain evidence at the proper time, a writ of error coram nobis will lie for subsequently or newly discovered evidence relating to matters which were litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at the trial.

T.C.A. § 40-26-105(b); see State v. Hart, 911 S.W.2d 371, 374 (Tenn. Crim. App. 1995). The decision to grant or deny such a writ rests within the sound discretion of the trial court. Harris v. State, 301 S.W.3d 141, 144 (Tenn. 2010). A petition for writ of error coram nobis must be filed within one year of the date the judgment becomes final in the trial court. T.C.A. § 27-7-103; State v. Mixon, 983 S.W.2d 661, 663 (Tenn. 1999); State v. Ratliff, 71

S.W.3d 291, 295 (Tenn. Crim. App. 2001).

Despite the one year statute of limitations, due process may require tolling of the limitations period if a petitioner seeks relief based upon newly discovered evidence of actual innocence. Harris, 301 S.W.3d at 145; Workman v. State, 41 S.W.3d 100, 101 (Tenn. 2001). "Before a state may terminate a claim for failure to comply with procedural requirements such as statutes of limitations, due process requires that potential litigants be provided an opportunity for the presentation of claims at a meaningful time and in a meaningful manner." Burford v. State, 845 S.W.2d 204, 208 (Tenn. 2002). Nevertheless, a petitioner seeking relief under the statute must exercise due diligence in presenting claims that fall outside the statute of limitations. Harris, 301 S.W.3d at 144; Mixon, 983 S.W.2d at 670. Our supreme court has said that determining whether due process requires tolling requires a three-step analysis in which the court must

> (1) determine when the limitations period would normally have begun to run; (2) determine whether the grounds for relief actually arose after the limitations period would normally have commenced; and (3) if the grounds are "later-arising," determine if, under the facts of the case, a strict application of the limitations period would effectively deny the petitioner a reasonable opportunity to present the claim. In making this final determination, courts should carefully weigh the petitioner's liberty interest in "collaterally attacking constitutional violations occurring during the conviction process," Burford, 845 S.W.2d at 207, against the State's interest in preventing the litigation of "stale and fraudulent claims." Id. at 208.

Sands v. State, 903 S.W.2d 287, 301 (Tenn. 1995) (footnote omitted).

The evidence presented at the Defendant's first trial provides context for the Defendant's coram nobis claims:

> In the early morning hours of October 17, 1998, the defendant, Takeita M. Locke, was riding in a car with her boyfriend, Jerry "Bam" Graves, Adam Faw (the driver), and Christina Martin. During the ride, the members of the group decided to rob someone and proceeded to the Montgomery Village Housing Project in Knoxville, Tennessee. Upon arriving in the parking lot, at around 5:00 a.m., Graves spotted Chuck Newman walking toward one of the apartments. Mr. Newman

knocked on the door of Karen Verklas' apartment and proceeded inside when she opened the door. Before Ms. Verklas could close the door, Graves barged inside and demanded Mr. Newman's money. When Newman refused, a struggle ensued.

Ms. Verklas had been inside with her boyfriend, [Robert] Richards, and both watched as Graves forced Mr. Newman onto the couch and began beating him with a gun around the head. They also both observed, during the struggle, the defendant enter the apartment and attempt to pry Mr. Newman's hand open while he was being pistol-whipped by Graves. After Ms. Verklas and Mr. Richards fled the apartment to summon help, Mr. Newman was fatally stabbed with a kitchen knife by either Graves or the defendant.

Investigator Samuel Brown of the Knoxville Police Department responded to the incident and interviewed both Ms. Verklas and Mr. Richards. Investigator Brown determined that the nicknames used by the suspects were "Sherry or Cherry" and "Bam." Subsequently, Investigator Brown spoke to other personnel at the Knoxville Police Department who informed him that a young woman named Takeita Bell may use the nickname "Cherry." As a result, Investigator Brown had Locke arrested and taken into juvenile custody. On October 18, 1998 and the following day, Investigator Brown interviewed the defendant at the Juvenile Detention Facility after informing her of her rights. She was later charged in Juvenile Court which issued an order on December 9, 1998 transferring her to Knox County Criminal Court for prosecution as an adult. Subsequently, a presentment charged the defendant and Graves with the offenses of felony murder and especially aggravated robbery.

The trial began on October 13, 1999, with the State calling Dr. Sandra Elkins, who is employed as the Knox County Medical Examiner and Director of Autopsy Services at the University of Tennessee Medical Center. Dr. Elkins performed the autopsy on Mr. Newman and testified that the stab wound was approximately 3.55 inches deep and was the cause of death. Dr. Elkins also noted that the curved lacerations on Mr.

Newman's skull were consistent with someone who had been struck in the head with an object such as the butt of a pistol.

The State then called several witnesses who linked the defendant to the murder of Mr. Newman. Both Ms. Verklas and Mr. Richards testified that Locke entered the apartment during the struggle and attempted to pry open the victim's hand while he was being beaten with the gun by Graves. Mr. Richards also stated that the defendant asked Graves, "How much does he have on him?" as she was attempting to pry open the victim's hand. Both Ms. Verklas and Mr. Richards also testified that they witnessed Graves and Locke leave the apartment together. Additionally, Adam Faw testified that after providing Graves with a gun, he watched from the car as Locke stood look-out at a garbage dumpster and then ran inside the apartment after the commotion began. The State then called Investigator Brown and Officer Lawrence Libscombe to detail the conflicting statements that had been offered by the defendant concerning the robbery and homicide of Chuck Newman.

For the defense, Melvina Terry testified that she was a resident of Montgomery Village and that she was outside in the parking lot when Mr. Newman was beaten and stabbed. Ms. Terry claimed that she witnessed Mr. Newman walk inside the Verklas apartment followed by two males. Ms. Terry further claimed that she and the defendant were standing outside talking while the attack occurred. Ms. Terry testified that after hearing some yelling and commotion coming from the Verklas apartment, Locke ran over to the apartment and came out five minutes later shaking. After this, Ms. Terry claimed that Graves emerged from the apartment with the gun and forced Locke to get in the car.

The defendant's mother, Mary Ann Bell, also testified on the defendant's behalf. Ms. Bell testified that Graves had routinely beaten Locke during their relationship; had stabbed Locke with a pair of scissors; and had once shot a gun at Ms. Bell herself. On cross-examination, Ms. Bell admitted that Ms. Terry was a personal friend of hers and that Ms. Terry routinely smoked crack cocaine. Lastly, the defendant took the stand in

her own defense. She claimed that on the day in question, she sat on some steps with Ms. Terry while Graves and Faw committed the robbery and murder of Chuck Newman. Locke further testified that she did not enter the apartment at any time.

Locke, 90 S.W.3d at 667-68 (footnotes omitted).

## Testimony of Jerry Graves

Jerry Graves, the Defendant's co-defendant, testified at the Defendant's second trial that he went to Verklas's house to sell drugs, not to commit a robbery. He said he killed the victim during a fight over the victim's failure to pay for the drugs. Facing the same charges as the Defendant, Graves did not testify at the Defendant's first trial. In Graves's trial, which took place between the Defendant's first and second trials, Graves testified that he did not rob the victim or attempt to rob him. Graves testified that he sold drugs and that the altercation with the victim was over a drug transaction. He denied that the Defendant was involved in the altercation with the victim. The parties stipulated for purposes of the coram nobis petition that Graves's trial counsel would not have permitted Graves to waive his Fifth Amendment privileges and testify at any time during her representation of him in the trial court and on direct appeal. The supreme court filed its opinion in State v. Graves, 126 S.W.3d 873 (Tenn. 2003), on May 27, 2003.

The Defendant claims that she "was unable to procure this testimony from Mr. Graves until he was subpoenaed to testify at her second trial." The Defendant argues that Graves's trial counsel would not let him testify during counsel's representation of him and that Graves's collateral review of his convictions "has only recently concluded." According to this court's records from Graves's appeal, Graves's trial was held on September 18 and 19, 2000. His conviction was final, and thus trial counsel's representation of him concluded, on May 27, 2003. Graves's unsuccessful attempt at obtaining post-conviction relief ended on August 25, 2008, when the supreme court denied permission to appeal. See Jerry Graves v. State, No. E2007-00064-CCA-R3-PC, Knox County (Tenn. Crim. App. Mar. 5, 2008), app. denied (Tenn. Aug. 25, 2008).

The Defendant failed to present her claim within one year of her conviction of especially aggravated robbery becoming final. Thus, we must consider whether she has been afforded, consistent with her right to due process, the opportunity to present her claim at a meaningful time and in a meaningful manner. The Defendant has established that Graves was an unavailable witness at her first trial. However, Graves then testified at his own trial in September 2000 to essentially the same facts as he testified at the Defendant's second trial in 2008. Even if we were to assume that Graves's testimony was later-arising evidence that

-9-

would have changed the result of the Defendant's first trial, the Defendant has not explained how Graves's testimony under oath in September 2000 did not trigger the one-year statute of limitations for the Defendant to bring her coram nobis claim. Had the Defendant pursued a timely coram nobis claim in which Graves was called as a witness but asserted his Fifth Amendment privilege, Graves could have been declared an unavailable witness and his prior sworn testimony may have been used as evidence to support the Defendant's assertion of newly discovered evidence. See Tenn. R. Evid. 804(a)(1), (b)(1). The Defendant did not file her coram nobis claim until 2008, eight years after the evidence was available to her. We note, as well, that Graves's direct appeal was concluded in 2003, and there is no proof that Graves would have asserted his Fifth Amendment privilege after that time. Further, we reject the Defendant's suggestion that Graves's pending post-conviction action had any tolling effect on her coram nobis statute of limitations. Cf. Harris, 301 S.W.3d at 146-47 ("No statute in Tennessee nor tolling rule developed at common law provides that the time for filing a cause of action is tolled during the period in which a litigant pursues a related but independent cause of action."). Although the Defendant argues that she had no way of presenting Graves's testimony until her second trial, she has not explained why she could not have subpoenaed him as a witness in a timely coram nobis proceeding. We conclude, therefore, that the Defendant was not denied a reasonable opportunity to present her claim for coram nobis relief based upon Jerry Graves's testimony, and due process does not require tolling of the statute of limitations.

**Testimony of Robert Richards**

The Defendant also seeks coram nobis relief based upon "newly discovered evidence" of Robert Richards' testimony at her second trial. She alleges that Richards' testimony at the second trial contradicted Verklas's testimony at both the first and second trials. Verklas testified on both occasions that the Defendant went into the apartment when Graves and the victim were struggling and that the Defendant tried to pry the victim's hands open. Richards testified at the second trial that the Defendant did not come into the apartment until Verklas had gone outside.

Richards testified at the Defendant's first trial, but his testimony did not address when the Defendant entered the apartment in relation to when Verklas left. Richards was a known and available witness for the first trial, and there is no allegation that he recanted earlier testimony at the second trial. A petitioner is required to show that he or she was not at fault in failing to present the evidence in question at the proper time. T.C.A. § 40-26-105(b). The Defendant has not offered any explanation for her failure to present this evidence at the first trial, nor has she explained how Richards' testimony on these facts was unavailable to her at the time of the first trial through the exercise of reasonable diligence. Evidence is not "newly discovered" as contemplated by the coram nobis statute merely because it was not

discovered at an earlier time. We conclude that Richards' testimony at the second trial was not later arising evidence and therefore not a proper basis for coram nobis relief.

## Testimony of Sam Brown

The Defendant claims newly discovered evidence in Sam Brown's testimony at the second trial that Verklas told him during his investigation that she left the apartment before the Defendant entered. The Defendant contends that this proof corroborates Verklas's statement in the 9-1-1 call that she was already outside when she saw the Defendant go into the apartment. The Defendant claims she had no way of knowing of Verklas's statement about leaving the apartment before the Defendant entered until Brown's testimony at the second trial. The Defendant has not claimed that the State concealed this information during the discovery process, and there is no indication that the Defendant could not have discovered it before the second trial with reasonable diligence. To the contrary, the record reflects that defense counsel cross-examined Brown at the second trial about the portion of his investigative report that memorialized Verklas's statement of these facts. Brown also testified that he had recorded an interview with Verklas. An investigative report was received as proof at the coram nobis hearing. The report states Verklas gave a statement to Brown in which she said that she went outside to get help after the victim and Graves were struggling, that she saw the Defendant go inside the apartment and slam and lock the door, and that the victim came outside minutes later stating that he had been stabbed. The existence of the report and the recorded interview suggest that the information was available during the discovery process, which would have taken place before both trials. The evidence was neither newly discovered evidence as contemplated by the coram nobis statute, nor has the Defendant established that the information could not have been presented at the first trial. The Defendant is not entitled to relief.

## Testimony of Joseph Newman

The Defendant's last claim of newly discovered evidence is the testimony of Joseph Newman at the second trial. Mr. Newman did not testify at the Defendant's first trial, and he testified at the second trial that he saw Graves and the victim exchange a bag of money in the housing project parking lot the day before the crimes. The Defendant claims that this corroborates Graves's testimony that the crimes arose from a drug deal that went afoul, rather than a robbery. The Defendant argues that she had no way of knowing until Newman's testimony at the second trial that Newman saw this transaction.

The Defendant's counsel argued at the coram nobis hearing that the witness was not disclosed during discovery. Counsel did not present proof to corroborate this claim, nor did counsel present evidence to show that despite the exercise of reasonable diligence, the

Defendant could not have discovered and presented Newman's testimony at the proper time. See T.C.A. § 40-26-105(b). We conclude that the portion of the coram nobis claim related to Joseph Newman's testimony was barred by the statute of limitations. The trial court properly dismissed the petition.

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE